Mitchell S. Chaban
**LEVIN GINSBURG**
180 North LaSalle Street, Suite 3200
Chicago, IL 60601
Telephone: (312) 368-0100

David E. De Lorenzi (admitted *pro hac vice)*
Frank A. Bruno (admitted *pro hac vice*)
**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102-5310
Telephone: (973) 596-4500

*Attorneys for Plaintiff*
*Pactiv Corporation*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PACTIV CORPORATION, | : |
| Plaintiff, | : |
| v. | :  Civil Action No.: 10-cv-00461 |
| | :  Hon. Harry D. Leinenweber |
| MULTISORB TECHNOLOGIES, INC., | : |
| Defendant. | : |

## OPENING CLAIM CONSTRUCTION BRIEF
## BY PLAINTIFF PACTIV CORPORATION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................iii

I.      INTRODUCTION ....................................................................................................1

II.     FACTUAL BACKGROUND......................................................................................2

III.    LAW OF CLAIM CONSTRUCTION .........................................................................2

IV.     CLAIM CONSTRUCTION OF THE DISPUTED CLAIM TERMS ..............................4

        A.      Terms And Phrases Identified By Pactiv For Construction....................................4

                1.      Particulate Annealed Electrolytically Reduced Iron
                        ('590 And '872 Patents)..........................................................................4

                        a.      The '590 And '872 Patent Specifications Support Pactiv's
                                Constructions ...............................................................................7

                        b.      Further Intrinsic Support For Pactiv's Construction Is
                                Found In The Prosecution History....................................................8

                2.      Salt ('590 And '872 Patents) ...................................................................11

                        a.      The Court May Use A Dictionary Definition Because The
                                Asserted Patents Do Not Provide A Definition...............................11

                        b.      Multisorb Is Estopped From Its Broad Proposed
                                Construction Due To Amendments Made During
                                Prosecution .................................................................................11

                3.      Moisture In Said Container.....................................................................13

                        a.      Intrinsic Support for Pactiv's Proffered Claim Construction.......14

                4.      Water-Attracting And Supplying Component ...........................................16

                        a.      Intrinsic Support For Pactiv's Proffered Claim Construction ......16

                        b.      Multisorb's Construction Is Not Referenced In The
                                Asserted Patent And Is Logically Flawed .....................................17

**TABLE OF CONTENTS**
(continued)

Page

B.    Terms And Phrases Identified by Multisorb For Construction ........................... 18

     1.    "In Sufficient Proportions" And "Including In Relatively Sufficient Proportions" .............................................................................................. 18

         a.    Intrinsic Support For Pactiv's Proffered Claim Construction ...... 19

         b.    These Claim Terms Cannot Be Construed Due To Lack Of Intrinsic Support .................................................................... 20

     2.    Tending To Retain Water ....................................................... 22

     3.    Electrolyte ('590 And '872 Patents) ........................................ 23

     4.    Salt For Combining With Water To Produce An Electrolyte ('590 And '872 Patents) .................................................................. 24

V.    CONCLUSION ............................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
  299 F.3d 1336 (Fed. Cir. 2002) .........................................................................................20

*Alpex Computer Corp. v. Nintendo Co. Ltd.*,
  102 F.3d 1214 (Fed. Cir. 1996) ...........................................................................................9

*Al-Site Corp. v. VSI Int'l, Inc.*,
  174 F.3d 1308 (Fed. Cir. 1999) .........................................................................................12

*Amgen, Inc. v. Chugai Pharmaceutical Co.*,
  927 F.2d 1200 (Fed. Cir. 1991) .........................................................................................21

*Computer Docking Station, Corp. v. Dell, Inc.*,
  519 F.3d 1366 (Fed. Cir. 2008) ...........................................................................................4

*Cybor Corp. v. FAS Technologies, Inc.*,
  138 F.3d 1448 (Fed. Cir. 1998) ...........................................................................................2

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005) .........................................................................................21

*Davis-Lynch, Inc. v. Weatherford Int'l, Inc.*,
  2009 U.S. Dist. LEXIS 33414 (E.D. Tex. Apr. 20, 2009) ...................................................6

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1322 (Fed. Cir. 2009) .........................................................................................15

*Exhibit Supply Co. v. Ace Patents Corp.*,
  315 U.S. 126 (1942).............................................................................................................24

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  234 F.3d 558 (Fed. Cir. 2000) ...........................................................................................13

*Halliburton Energy Services, Inc. v M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008) .........................................................................................18

*In re Donaldson*,
  16 F.3d 1189 (Fed. Cir. 1994) ...........................................................................................12

*In re Oetiker*,
  23 U.S.P.Q.2d 1641 (1990) ...............................................................................................22

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) ...........................................................................................4

*Lantech, Inc. v. Keip Mach. Co.*,
  32 F.3d 542 (Fed. Cir. 1994) ..............................................................................21, 25

*Litton Sys., Inc. v. Honeywell, Inc.*,
  140 F.3d 1449 (Fed. Cir. 1998) ....................................................................................9

*Loctite Corp. v. Ultraseal, Ltd.*,
  781 F.2d 861 (Fed. Cir. 1985) ....................................................................................19

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) .....................................3, 4

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
  357 F.3d 1340 (Fed. Cir. 2004) ....................................................................................3

*Netword, LLC v. Central Corp.*,
  242 F.3d 1347 (Fed. Cir. 2001) ....................................................................................2

*Nystrom v. Trex Co.*,
  424 F.3d 1136 (Fed. Cir. 2005) ....................................................................................2

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ........................................................................6, 8, 9, 12

*On Demand Machine Corp. v. Ingram Indus.*,
  442 F.3d 1331 (Fed. Cir. 2006) ....................................................................................3

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007) ....................................................................................8

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ....................................................................3, 4, 14, 24

*Phonometrics, Inc. v. N. Telecom*,
  133 F.3d 1459 (Fed. Cir. 1998) ...................................................................................24

*Randall May Int'l, Inc. v. DEG Music Prods., Inc.*,
  378 Fed. Appx. 989 (Fed. Cir. 2010)........................................................................21, 25

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ...................................................................................19

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
  311 U.S. 211 (1940)..............................................................................................6, 12

*Schwing GmbH v. Putzmeister Aktiengesellschaft*,
  305 F.3d 1318 (Fed. Cir. 2002) ....................................................................................8

*Sipco, LLC v. Datamatic, Ltd.*,
  2011 U.S. Dist. LEXIS 48743 (E.D. Tex. May 6, 2011).....................................................6

*Southwall Technologies v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) ...................................................................8

*Std. Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) .................................................10, 12, 21

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) ...............................................................4

*Texas Instruments v. United States ITC*,
    988 F.2d 1165 (Fed. Cir. 1993) .............................................................10

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..........................................................3, 14

## <u>STATUTES</u>

35 U.S.C. § 112..................................................................................passim

## <u>OTHER AUTHORITIES</u>

DOMINIC V. ROSATO,
    ROSATO'S PLASTICS ENCYCLOPEDIA AND DICTIONARY (1993)................................11

HAWLEY'S CONDENSED CHEMICAL DICTIONARY
    (Richard J. Lewis Sr., ed, 14th ed. 2001) ...............................................5

THE AMERICAN HERITAGE COLLEGE DICTIONARY (3d ed. 1993) ..................................24

Pursuant to the Local Patent Rules for the United States District Court for the Northern District of Illinois and the Court's revised schedule of events under the Local Patent Rules set forth during the hearing on December 15, 2011, Pactiv Corporation ("Pactiv") respectfully submits this Opening Claim Construction Brief in support of its construction of the disputed terms and phrases in U.S. Patent No. 5,332,590 (the "'590 patent") and U.S. Patent No. 6,436,872 (the "'872 patent"), which are respectively attached as Exhibits 1 and 3 of the Joint Appendix ("JA").

## I.    INTRODUCTION

Pactiv originally brought this patent infringement suit against Defendant, Multisorb Technologies, Inc. ("Multisorb"), alleging infringement of certain patents covering modified atmosphere packaging. Multisorb countered with two of its own patents, the '590 and '872 patents ("the Multisorb patents-in-suit").

As described by Pactiv, its patents-in-suit relate to removing oxygen from a sealed container to prevent degradation of refrigerated food through the use of a sachet or packet containing an oxygen absorbing composition. Preventing food degradation extends the length of time during which the food may be refrigerated and transported and allows food to retain value. The same or similar technology is also described in patents cited on the face of the Multisorb patents-in-suit.

In accordance with the Court's Scheduling Order and Local Patent Rule 4.1, the parties identified the following ten terms for construction by the Court:

| Claim Terms Identified by Pactiv | Claim Terms Identified by Multisorb |
|---|---|
| • particulate annealed electrolytically reduced iron;<br>• salt;<br>• moisture in said container; and | • particulate annealed electrolytically reduced iron;<br>• salt;<br>• electrolyte; |

| Claim Terms Identified by Pactiv | Claim Terms Identified by Multisorb |
|---|---|
| • water-attracting and supplying component; | • salt for combining with water to produce an electrolyte; <br> • water-attracting and supplying component; <br> • including in relatively sufficient proportions/in sufficient proportions; <br> • tending to retain water; and <br> • activated carbon. |

In this brief, Pactiv provides evidence supporting its constructions and responds to Multisorb's proposed constructions.

## II.    FACTUAL BACKGROUND

The Multisorb patents-in-suit claim priority to a common ancestral patent application -- the 07/888,966 application ("'966 application") -- filed on May 26, 1992 that matured into U.S. Patent No. 5,262,375 (the "'375 patent"). A complete family tree showing the relationship between the asserted '590 and '872 patents and the '375 patent is shown in Exhibit 1 of Pactiv's Supplemental Appendix ("SA"). The application that matured into the '590 patent was filed on July 26, 1993 and issued on July 26, 1994, and the application that matured into the '872 patent was filed on May 2, 2001 and issued on August 20, 2002.

The prosecution history of the '590 and '872 patents, where relevant to the construction of claims, is further detailed in Pactiv's analysis of the claim construction of the disputed claim terms.

## III.    LAW OF CLAIM CONSTRUCTION

Claim construction is the judicial statement of what is and is not covered by the technical terms and other words of the claims. *Netword, LLC v. Central Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001). It is well-established that claim construction is a question of law for the Court. *See Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998); *see also Nystrom v. Trex Co.*, 424 F.3d 1136, 1141 (Fed. Cir. 2005).

"[T]he words of a claim 'are generally given their ordinary and customary meaning,' . . . [which] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . . [viewed] in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (internal citaotion omitted).

To determine this ordinary meaning, a court should first evaluate the words of the claims themselves in the specification. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). A court should also review the specification to determine the proper construction as "[u]sually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quotation omitted).

The specification can be dispositive because it can act like a dictionary in either explicitly or implicitly defining terms. *Vitronics*, 90 F.3d at 1582. However, the specification also provides an upper bound of the invention as 'the claims cannot be of broader scope than the invention that is set forth in the specification." *On Demand Machine Corp. v. Ingram Indus.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006).

The specification is also important because it may "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor . . . [which] is regarded as dispositive." *Phillips*, 415 F.3d at 1316 (citation omitted); and *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347-49 (Fed. Cir. 2004).

Along with reviewing the claims themselves and specification, a court should also consider the prosecution history of the patents-at-issue, including any related patents. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc); *Vitronics*, 90 F.3d at 1582. The prosecution history, like the specification, "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether

the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citation omitted).

And just like claim scope can be disclaimed in the specification, "'a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution,' . . . for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art." *Computer Docking Station, Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-76 (Fed. Cir. 2008) (internal citation omitted). Prosecution disclaimer "can lie in a single distinction among many [to distinguish prior art]." *Id.* at 1377.

Finally, if claim language is still unclear after a review of the intrinsic record (e.g., specification, prosecution history, and other intrinsic evidence), a court "may look to extrinsic evidence to help resolve the lack of clarity." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001). This can include, for example, dictionaries as well as inventor and expert testimony. *Markman*, 52 F.3d at 980; *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202-04 (Fed. Cir. 2002).

## IV. CLAIM CONSTRUCTION OF THE DISPUTED CLAIM TERMS

### A. Terms And Phrases Identified By Pactiv For Construction

#### 1. Particulate Annealed Electrolytically Reduced Iron ('590 And '872 Patents)

| Claim Term '590 and '872 Patents | Pactiv's Proposed Construction | Multisorb's Proposed Construction |
|---|---|---|
| particulate annealed electrolytically reduced iron | particulate iron that is electrolytically reduced (not chemically hydrogen reduced) and subsequently annealed | particles of iron that have been annealed and electrolytically reduced to enhance their purity |

Pactiv and Multisorb disagree regarding the construction of the claim term 'particulate annealed electrolytically reduced iron' which is found in claims 1 and 2 of the '590 patent and

claims 1-3 of the '872 patent. Pactiv proffers that the claimed iron is electrolytically reduced, not chemically hydrogen reduced, and subsequently annealed.

As a background, electrolytic reduction is a process for reducing the oxidation state of iron through electrolysis. HAWLEY'S CONDENSED CHEMICAL DICTIONARY 436, 955 (Richard J. Lewis Sr., ed, 14th ed. 2001), (SA at 400, 403); *see also* Declaration of Dr. Lisa D. Detter-Hoskin ("Detter-Hoskin Decl.") at ¶6. In layperson terms, electrolytic reduction means reducing iron oxide using an electric current. *Id.* at ¶7. This process occurs by placing the iron oxide in an electrolyte bath and applying a voltage across electrodes within the bath. *Id.* This process refines the iron to a lower oxidation state, that is, it removes the oxide, or rust, from the iron particles. *Id.*. In its most simplified description, annealing is the heating of a component to a critical temperature to reduce stress, thereby, altering the physical properties -- such as, for example, malleability, ductility, etc. -- of that component. HAWLEY'S CONDENSED CHEMICAL DICTIONARY at 78, (SA at 397). Multisorb, in its asserted patents, claims that performing annealing on electrolytically reduced iron increases the rate by which the iron can absorb oxygen. *See* '590 patent col.6 l.11-15; '872 patent col.8 l.59-63.

In terms of construction, the intrinsic record demonstrates that electrolytically reduced iron is distinguishable from hydrogen or chemical reduced iron. Pactiv further submits that Multisorb's claimed iron must be annealed in a step subsequent to the electrolytic reduction.

In contrast, Multisorb's construction attempts to impermissibly alter the scope of the term 'particulate annealed electrolytically reduced iron' by reading words into the claims in direct violation of Federal Circuit precedent and avoiding statements it made before the United States Patent and Trademark Office ("PTO") during prosecution of the '375 patent. Specifically, Multisorb's proposed construction -- "particles of iron that have been annealed and electrolytically reduced to enhance their purity" -- misconstrues the term by suggesting that the

annealing step may occur first. This is contrary to Multisorb's statements to the PTO during prosecution of the '375 patent when Multisorb argued that the iron is first electrolytically reduced and then subsequently annealed. *See infra* at (IV)(A)(1)(b). As detailed herein, Multisorb is therefore estopped under *Schriber-Schroth Co. v. Cleveland Trust Co.,* 311 U.S. 211, 220-21 (1940) and *Omega Eng'g, Inc. v. Raytek Corp*., 334 F.3d 1314, 1326-27, n.1 (Fed. Cir. 2003) from asserting that the annealing step may occur first.

Multisorb also argued before the PTO that particulate annealed electrolytically reduced iron is distinct from annealed hydrogen reduced iron. Thus, Multisorb is similarly estopped from asserting that the term 'particulate annealed electrolytically reduced iron' encompasses annealed hydrogen reduced iron. Finally, Multisorb also attempts to narrow the term 'particulate annealed electrolytically reduced iron' by introducing in its construction the phrase 'to enhance their purity' as a limitation on the claim. Nowhere in the claim, specification or prosecution history of the asserted patents is there a reference to purity of the iron. Therefore, Multisorb's attempt to include this new limitation is impermissible based on well-established Federal Circuit precedent. *See Sipco, LLC v. Datamatic, Ltd*., 2011 U.S. Dist. LEXIS 48743, 22-24 (E.D. Tex. May 6, 2011) (The court rejected the defendant's proposed construction for "gateway" in part because the definition improperly imported new limitations into the claims, such as "the receiving network."); *see also Davis-Lynch, Inc. v. Weatherford Int'l, Inc*., 2009 U.S. Dist. LEXIS 33414, at *35-39 (E.D. Tex. Apr. 20, 2009) (rejecting defendant's claim constructions that argued that the flapper valves be completely sealed off from fluid flow because the construction imported a new limitation into the claim requiring complete sealing).

> ### a. The '590 And '872 Patent Specifications Support Pactiv's Constructions

Support for Pactiv's proffered claim construction -- particles of iron that have been electrolytically reduced (not chemically hydrogen reduced) and subsequently annealed -- is found in the '590 patent col.1 l.15-24 and the '872 patent col.1 l.21-29, which both read:

> In the past, various types of particulate iron have been used, including hydrogen reduced iron, electrolytically reduced iron, atomized iron, and milled pulverized iron. However, the hydrogen reduced iron, the atomized iron and the milled pulverized iron absorb oxygen relatively slowly. The electrolytically reduced iron absorbs oxygen faster but at lower temperatures at which food are normally refrigerated it absorbs oxygen at a slower rate than desired to remove the oxygen before the initial stages of food spoilage commence. (JA at 5, 76).

In this repeated passage, the inventor expressly draws a distinction between the claimed electrolytically reduced iron and hydrogen reduced iron, which is reduced by a chemical (hydrogen) process. Further support for Pactiv's construction is found in the '872 patent col.7 l.54-59, which reads: "[a]s noted above, the oxygen absorber containing the particulate annealed electrolytically reduced iron is also more effective at ambient temperatures than such a product which has not been annealed or other types of particulate iron which have heretofore been used for oxygen absorption." (JA at 79). This portion further supports Pactiv's position that the claimed iron is electrolytically reduced rather than chemically reduced.

In the '590 patent col.2 l.31-35 and the '872 patent col.3 l.3-6, additional support for Pactiv's position is found where the specifications read: "[i]n this respect, it is believed that the annealing changes the structure of the electrolytically reduced iron by increasing the surface area which, in turn, causes it to be more active in its oxygen-absorbing capacity." (JA at 5). This text expressly conveys that the electrolytic reduction of the iron occurs first and before annealing.

> ### b.    Further Intrinsic Support For Pactiv's Construction Is Found In The Prosecution History

During prosecution of the '375 patent, the applicant made the following two significant disclaimers to the PTO that support Pactiv's construction; (1) the claimed iron is not hydrogen reduced annealed iron, and (2) the claimed iron must be electrolytically reduced, then annealed. Since the '375 patent is a parent to both the '590 and '872 patents and relates to the same subject matter, Multisorb's statements made during prosecution of the '375 patent are properly applied to the '590 and '872 patents for purposes of prosecution disclaimer. *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007) ("When the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant in construing the claims at issue."). As discussed in more detail below, Multisorb's inventor argued that hydrogen-annealed reduced iron was different from and inferior to the claimed particulate annealed electrolytically reduced iron. Therefore, under the doctrine of prosecution disclaimer, Multisorb may not now claim otherwise. "A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record." *Southwall Technologies v. Cardinal IG Co*., 54 F.3d 1570, 1578 (Fed. Cir. 1995).

For prosecution disclaimer to attach, the alleged disavowing actions, statements or arguments made during prosecution must evince a clear and unmistakable surrender of subject matter, not an 'equivocal' one. *Omega Eng'g, Inc.*, 334 F.3d at 1326-27, n.1; *e.g., Schwing GmbH v. Putzmeister Aktiengesellschaft,* 305 F.3d 1318, 1325 (Fed. Cir. 2002) ("[P]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed

- 8 -

coverage of the relevant subject matter.") (citation omitted).[1] Multisorb's arguments made during prosecution of the asserted patents and the '375 patent are clear disclaimers of scope.

In a first office action, dated December 28, 1992 ("First Office Action") at pages 4-5, the examiner rejected claims 1-12 of the application that matured into the '375 patent as obvious in view of U.S. Patent No. 4,192,773 to Yoshikawa ("Yoshikawa") in combination with U.S. Patent No. 5,151,262 to Pemsler ("Pemsler"). (SA at 45). According to the examiner, Yoshikawa discloses all of the elements of the claimed oxygen absorber except for annealed electrolytically reduced iron powder. (SA at 46). Yoshikawa discloses electrolytically reduced iron powder, but does not disclose electrolytically reduced iron powder that has been annealed. Yoshikawa col.2 l.66. Pemsler discloses reduced iron that has been annealed, both processes using hydrogen ("Pemsler's Hydrogen-Annealed Reduced Iron"). Pemsler col.2 l.36-47. The examiner found the claims of the application of the '375 patent obvious because the electrolytically reduced iron Yoshikawa could be annealed as shown in Pemsler to produce Multisorb's claimed annealed electrolytically reduced iron. (SA at 46).

In Multisorb's April 1, 1993 response to the First Office Action ("Response"), the inventor McKedy, submitted a declaration arguing Pemsler's Hydrogen-Annealed Reduced Iron was different from Multisorb's claimed annealed electronically reduced iron, stating unequivocally that they "are two entirely different products." (SA at 56, 60). According to

---

[1] The Federal Circuit noted that the standard for argument-based estoppel and disclaimer is the same: the alleged disavowing actions or statements made during prosecution must be both clear and unmistakable. *Omega Eng'g, Inc.*, 334 F.3d at 1326 n.1; *see also Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1458 (Fed. Cir. 1998) (precedent has recognized a relation between the doctrines of argument-based estoppel and prosecution disclaimer); *Alpex Computer Corp. v. Nintendo Co. Ltd.*, 102 F.3d 1214, 1221 (Fed. Cir. 1996) (noting that "[j]ust as prosecution history estoppel may act to estop an equivalence argument under the doctrine of equivalents, positions taken before the PTO may bar an inconsistent position on claim construction").

McKedy, Pemsler's Hydrogen-Annealed Reduced Iron has not been electrolytically reduced before it has been hydrogen annealed. (SA at 55, 59).

Multisorb's statements support Pactiv's proposed construction for Multisorb's claimed iron. First, the inventor, McKedy, admitted that the claimed iron cannot be hydrogen reduced annealed iron. (SA at 55, 59-60). This statement supports Pactiv's construction that electrolytically reduced iron is "(not chemically hydrogen reduced)." Second, McKedy admitted the claimed iron must be electrolytically annealed then reduced, which supports Pactiv's construction that the iron must be "electrolytically reduced . . . and subsequently annealed." (SA at 56, 60). Multisorb's statements in its Response are a clear and unmistakable surrender of subject matter through argument. *See Std. Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452-453 (Fed. Cir. 1985) (applicant disclaimed metallic copper, as 'outside [the] claims' and therefore could not later assert as an equivalent to the claimed copper ions). Upon making this surrender, Multisorb relinquished any interpretation of its claimed iron that would include hydrogen-annealed reduced iron.

Multisorb, in its Response, further submitted experimental data showing the alleged "superior oxygen-absorbing capabilities" of the claimed particulate annealed electrolytically reduced iron over Pemsler's Hydrogen-Annealed Reduced Iron. (SA at 56, 61). Pactiv is a competitor with Multisorb in the oxygen absorber market and is thus entitled to "rely on the record made in the Patent Office in determining the meaning and scope of [Multisorb's] patent." *Texas Instruments v. United States ITC*, 988 F.2d 1165, 1174 (Fed. Cir. 1993). By stating that Pemsler's Hydrogen-Annealed Reduced Iron was inferior and would not provide the claimed results, Multisorb clearly and unmistakably surrendered any interpretation of its claim including Pemsler's Hydrogen-Annealed Reduced Iron.

- 10 -

### 2. Salt ('590 And '872 Patents)

| Claim Term '590 and '872 Patents | Pactiv's Proposed Construction | Multisorb's Proposed Construction |
|---|---|---|
| salt | The compound formed as the result of the reaction of acids and alkalis. | a substance that dissolves in moisture to form an electrolyte |

The parties dispute the scope of the term 'salt.'

### a. The Court May Use A Dictionary Definition Because The Asserted Patents Do Not Provide A Definition

Neither the '590 nor the '872 patent specifications specifically define the term salt, providing instead a list of eleven candidate salts including sodium chloride.[2] Pactiv's position is that the dictionary meaning of salt -- that salt includes all compounds resulting from the reaction of an acid and an alkali -- best provides the broadest reasonable interpretation of the term. *See* DOMINIC V. ROSATO, ROSATO'S PLASTICS ENCYCLOPEDIA AND DICTIONARY 662 (1993). (SA at 393). Every one of the eleven candidate salts satisfies Pactiv's construction of the term salt. Multisorb's construction includes <u>any</u> substance that when dissolved in moisture would form an electrolyte. The group of elements or compounds encompassed by Multisorb's broad construction is considerably larger than that of a salt -- including, for example, acids and bases, which are used to make salts but are not salts themselves. *See* Detter-Hoskin Decl. at ¶5. Multisorb's construction is unacceptably broad to a point of vagueness and ambiguity and should be rejected.

### b. Multisorb Is Estopped From Its Broad Proposed Construction Due To Amendments Made During Prosecution

---

[2] "Other equivalent salts may be substituted for the sodium chloride, and these include, without limitation, calcium chloride, potassium chloride, magnesium sulfate, magnesium chloride, barium chloride, potassium nitrate, potassium phosphate, potassium hypophosphate, sodium carbonate and potassium carbonate." '590 patent col.3 l.11-12 and the '872 patent col.3 l.58-59. (JA at 6, 77).

Multisorb's amendments to the claims of the '375 patent during prosecution further undermine its broad proposed construction for the term "salt." As discussed below, to overcome a rejection by the examiner, Multisorb amended all instances of "salt means" to "salt" in the claims. By that amendment, under the doctrine of prosecution disclaimer, Multisorb disclaimed any interpretation except salt in its physical form, and Multisorb is estopped from now attempting to recapture those previously disclaimed specific meanings. *Omega Eng'g, Inc.*, 334 F.3d at 1323; s*ee Schriber-Schroth Co.,* 311 U.S. at 220-21 ("It is a rule of patent construction consistently observed that . . . the claims allowed cannot by construction be read to cover what was thus eliminated from the patent.") (citations omitted); *see also Std. Oil Co.*, 774 F.2d at 452 ("the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.").

As filed, independent claim 1 of the application that matured into the '375 patent included the limitation "salt means for producing an electrolyte." (SA at 31). In the First Office Action, the examiner gave that means-plus-function limitation the "broadest possible interpretation" beyond the structure and examples of salt listed in the specification, which was accepted PTO practice at the time. *See In re Donaldson*, 16 F.3d 1189, 1194 (Fed. Cir. 1994);[3] *see also Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1315-17 (Fed. Cir. 1999) (affirming the jury's finding of infringement based on the fact that the glue adhesive was equivalent, had known interchangeability, to the structure disclosed in the specification, a rivet or button, as a 'fastening means' on hanger tag for glasses). Consequently, the examiner rejected claim 1 under

---

[3] The PTO's interpretation of means-plus-function claim limitations later changed dramatically due to the Federal Circuit's 1994 decision in *In re Donaldson*, 16 F.3d 1189 (Fed. Cir. 1994) (instructing examiners to limit constructions of means-plus-function limitations to the corresponding structure, materials or acts described in the specification and equivalents thereof).

35 U.S.C. § 112, ¶¶ 1, 2, because the "term --<u>salt means</u>--includes material beyond the scope of the invention and is indefinite without further specificity or qualification." (SA at 44).

In its Response, Multisorb argued it was "entitled to claim the 'salt means' broadly because of the large range of salts specifically recited in the last paragraph of page 6 of the specification." (SA at 53). Multisorb later relented, abandoning this argument, and instructed the examiner to amend "salt means" to "salt" after a June 9, 1993 telephone interview with the examiner. *See* Notice of Allowability of June 10, 1993, (SA at 62-64).

By deleting the word "means" after "salt," Multisorb and the examiner intentionally narrowed the limitation. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 589 (Fed. Cir. 2000) (during prosecution, the applicant narrowed 'sealing means' to first and second sealing rings). Therefore, due to prosecution history disclaimer Multisorb is not entitled to seek a construction, such as the one it does here, broader than a standard definition of a salt referring solely to its physical form.

The distinction is important because "salt means" requires the Court to look at the <u>function</u> of the salt. This is just as Multisorb seeks in relying on a construction that contains no structure, but instead focuses on the function -- to form an electrolyte. However, the amendment away from a "means-plus-function" type of claim removed the functional element, and the claim construction analysis is now properly limited to the <u>physical form</u> -- namely, a particular type of compound <u>regardless of function</u>. This is the proper construction that Pactiv seeks.

### 3. Moisture In Said Container

| Claim Term (′590 patent, claim 1) | Pactiv's Proposed Construction | Multisorb's Proposed Construction |
|---|---|---|
| moisture in said container | moisture released from the food product in the container and its environment (air) | No construction proposed |

- 13 -

The phrase 'moisture in said container' appears in claim 1 of the '590 patent. Pactiv submits that this claim term should be interpreted as moisture released from the food product in the container and its environment (air). The container is hermetically sealed enclosing whatever moisture is present in the meat and sealing environment at the time the container is closed. The moisture in said container may only be supplied from the container environment at sealing. The envelope containing the oxygen-absorbing composition neither contains nor contributes moisture; therefore, the moisture in said container comes from the food product in the container and its environment (air). While Multisorb does not offer an interpretation of this claim, it expressly defined the term in the specification. "[T]he specification 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'" *Phillips*, 415 F.3d at 1321 (citing *Vitronics Corp.*, 90 F.3d at 1582). Within the specification, Multisorb has chosen to define the term moisture in said container as moisture released from the food product in the container and its environment (air), and, as such, that definition should control.

a.   *Intrinsic Support for Pactiv's Proffered Claim Construction*
     *- the Patent Specification*

Intrinsic evidence of the '590 patent supports Pactiv's construction that the moisture in said container is the moisture released from the food product in the container and its environment (air). In the specification, Multisorb admits that the envelope (within the packet) is permeable and thus allows moisture to enter.

> A packet for absorbing oxygen including . . . [an] envelope containing the oxygen-absorbing composition [where the] oxygen absorber is packaged in a moisture and oxygen <u>permeable envelope</u> which will permit oxygen and <u>moisture to pass there through to</u> combine with the particulate annealed electrolytically reduced iron . . . .

'590 patent, at [57]; '590 patent col.3 l.67 - col.4 l.3 (emphasis added) (JA at 1, 3).

The package or packet described above is specifically designed to be permeable so that moisture will be obtained from *outside* the package. Other statements in the specification show that the only place to obtain the moisture outside the package is from within a container because the container is hermetically sealed and impervious to air.

> The envelope containing the oxygen-absorbing composition comprises a packet which is placed in various types of containers including the type wherein meat is placed on a plastic tray and wrapped with shrink-wrap or other plastic which causes the container to be hermetically sealed.

'590 patent col.4 l.10-16 (emphasis added); col.4 l.16-17 (discussing packets can be "placed in cans or jars which are sealed.") (JA at 6).

Examples provided by Multisorb further bolster Pactiv's construction. Example 1 discusses a composition placed in a sealed envelope inside a sealed jar having a blotter paper (but outside the envelope) that provides moisture from outside the packet but inside the sealed jar. '590 patent col.5 l.26-39, JA at 7. Example 2 is the same, but in this case a sealed container is used, rather than a sealed jar. '590 patent col.5 l.42-53, JA at 7.

Multisorb decided to be its own lexicographer and thus the meaning ascribed by it should control. *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) (patentee's defined term "overrides any ordinary meaning of the word . . . that might allow . . . [it to be different]"). Accordingly, "moisture in said container" should be construed as "moisture released from the food product in the container and its environment (air)."

### 4.        Water-Attracting and Supplying Component

| Claim Term (`590 patent, claim 3, 4 & 5) | Pactiv's Proposed Construction | Multisorb's Proposed Construction |
|---|---|---|
| water-attracting and supplying component | a material that attracts moisture from the food product and its environment and supplies moisture to the oxygen-absorbing composition | a substance (including, without limitation, cellulose or activated carbon) that releasably retains moisture |

Pactiv and Multisorb disagree with regard to the construction of the water attracting and supplying component of claims 3, 4, and 5 of the '590 patent. Pactiv proffers that "water-attracting and supplying component" should be construed as a material that attracts moisture from the food product and its environment and supplies moisture to the oxygen-absorbing composition. Pactiv submits that the water-attracting and supplying component draws moisture from the container into the packet. Pactiv further submits that the water-attracting and supplying component provides moisture to the oxygen-absorbing composition. In contrast, Multisorb's construction, "a substance (including, without limitation, cellulose or activated carbon) that releasably retains moisture," is indefinite because it appears nowhere in the specification and is vague, providing one of skill in the art no reference to practice the claims.

#### a.        Intrinsic Support For Pactiv's Proffered Claim Construction

As explained in the '590 patent, the water-attracting and supplying component is placed inside the envelope and specifically as part of the alleged oxygen-absorbing composition.

> An oxygen-absorbing composition containing particulate annealed electrolytically reduced iron . . . , a salt . . . , and optionally a water-attracting and supplying component such as silica gel . . . .

'590 patent, at [57] (emphasis added); *see also* '590 patent col.3 l.55-66 ("When the water-attracting and supplying component is used, the salt can be added to both the silica gel and to the

iron <u>prior to combining them</u>.") (emphasis added) (JA at 6); '590 patent col.6 l.16-18, ("said envelope further contains a water-attracting and supplying component.") (JA at 7); '290 Application, claim 15 (". . . including the step of adding a water-attracting and supplying component to said envelope.") (JA at 31). It is also explained in the specification that the purpose of the component was to attract moisture from the food product and its environment in the container supplying it to the composition within the packet. *See* '590 patent col.7 l.23 - col.8 l.11 (". . . for said salt to combine <u>with moisture in said container</u> to form an electrolyte which in turn activates said iron to absorb oxygen in said container.") (emphasis added)) (JA at 8); '590 patent col.3 l.45-50 (". . . in environments wherein the amount of moisture is relatively low, a water-attracting and supplying component can be added to the particulate annealed electrolytically reduced iron and salt. . . . [Silica gel] has a <u>water-attracting and supplying capacity</u>. . . .") (emphasis added)) (JA at 6). The composition is contained in an envelope that as noted herein is permeably sealed to allow "<u>moisture to pass there through to</u> combine with the particulate annealed electrolytically reduced iron . . . ." '590 patent col.3 l.67 - col.4 l.3 (emphasis added) (JA at 6). The moisture is provided by blotter paper containing water that is placed within the container. '590 patent col. 5 l.35, 45; col.6 l.26, 55 (JA at 7); '872 patent col.8 l.17, 27 (JA at 79). Thus, the "water-attracting and supplying component" must be a material that attracts moisture from the food product and its environment and supplies moisture to the oxygen-absorbing composition.

> b.     *Multisorb's Construction Is Not Referenced In The Asserted Patent And Is Logically Flawed*

Multisorb's construction has two logical flaws. First, it introduces the oxymoron "releasably retains" into the construction. Such a term has no well-defined meaning, and it is not at all apparent how a jury would apply such a construction to any facts of the case. Does a

compound that releases moisture meet the claims? Does a compound that retains moisture meet the claims? Must it release and retain moisture at the same time? The construction itself vitiates the purpose of claim construction by leaving the fact-finder more confused than had the term not been construed. Second, Multisorb equates two words -- "attracting" (which is found in the claims) with "retains" (which is not). But those two words are not synonyms. Multisorb appears to conflate two separate actions (i.e., attracting and releasing) into one action. There are myriad examples of things that will retain, without attracting water. An empty cup will retain, without attracting, water. Even the human body retains, without attracting, water. "Attracting" is an active process that draws moisture in. "Retains" is a passive process that describes what happens to the water once it is already there. The terms are not synonymous, and Multisorb's construction must be rejected for that additional reason.

Multisorb construction would prejudice Pactiv as it would provide no notice or ability for Pactiv to determine what would constitute alleged infringement. *Halliburton Energy Services, Inc. v M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) (holding that a claim is indefinite when "a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification and the prosecution history, as well as her knowledge of the relevant art."). Moreover, the construction proposed is not supported by any intrinsic evidence as shown above.

**B.    Terms and Phrases Identified by Multisorb For Construction**

**1.    "In Sufficient Proportions" And "Including In Relatively Sufficient Proportions"**

| Claim Term '590 patent, claim 1 and '872 patent, claims 1-3 | Pactiv's Proposed Construction | Multisorb's Proposed Construction |
|---|---|---|
| in sufficient proportions AND including in relatively sufficient proportions | a predetermined amount of iron, salt, and water | in an amount required to produce a desired outcome |

Pactiv and Multisorb dispute the meaning of the phrases "in sufficient proportions" and "including in relatively sufficient proportions."

        *a.*     *Intrinsic Support For Pactiv's Proffered Claim Construction*

Pactiv submits that the term should be interpreted as a predetermined amount of iron, salt, and water. Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). However, an interpretation provided in the prosecution history shapes the claim scope. *See Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 867 (Fed. Cir. 1985) (holding that while the term was not explicitly limited by the specification, it was "expressly defined" in the prosecution history).

As provided in the specifications of the '590 and '872 patents, "[t]he salt is preferably sodium chloride which may be present by weight in an amount of between about 0.4% to 3.5%." '590 patent col.3 l.11-13 and '872 patent col.3 l.58-60. '590 patent col.3 l.18-20 (JA at 6) and '872 patent col.3 l.65-66. As further provided in the specifications, moisture is provided by blotter paper containing various quantities of water that is placed within the container. '590 patent col.5 l.35 (one gram of water); col.5 l.45 (four grams of water); col.6 l.26 (one gram of water); col.6 l.55 (one gram of water); '872 patent col.8 l.17 (one gram of water); col.8 l.27 (four grams of water). The specifications do not disclose any substance other than water to provide moisture.

During prosecution of the '375 patent, the examiner rejected claims 1-12 under 35 U.S.C. § 112. The Examiner stated that "Absent the specific proportion of each component the claims encompass embodiments outside the purview of the invention and are indefinite." (SA at 44). In response, Multisorb argued it was entitled to "annealed electrolytically reduced iron, and salt

means" in "relatively sufficient proportions." (SA at 52). The applicant argued that the specification recites that "the iron is present by weight in an amount of up to about 99.6%." (SA at 52). Furthermore, Multisorb argued that the specification recites that "the sodium chloride may be present by weight in an amount of between about .4% and 3.5% " and that the "exact amount of sodium chloride is not critical." (SA at 52). Based on this argument, the disclosure inherently recites a range of iron in the amount of between 96.5% and 99.6%. Pactiv argues that the limitations "in sufficient proportions" and "including relatively sufficient proportions" as recited in claim 1 of the '590 patent and claims 1-3 of the '872 patent limit the amount of salt and iron to a predetermined amount of iron and salt based on the amounts argued by Multisorb to overcome the § 112 rejection. Multisorb argued for patentability using specific, predetermined numerical limitations listed in the specification to be incorporated into the claim to overcome a § 112 rejection and, therefore, cannot now argue for a broad interpretation such as its proposed "in an amount required to produce a desired outcome."

> ### b. These Claim Terms Cannot Be Construed Due To Lack Of Intrinsic Support

In the alternative, neither claim 1 of the '590 nor claims 1-3 of the '872 have sufficient intrinsic support for these claim terms. Under 35 U.S.C. § 112, ¶ 2, "[t]he specification shall conclude with one or more claims <u>particularly pointing out and distinctly</u> claiming the subject matter which the applicant regards as his invention." (emphasis added). That section requires an applicant to set forth what he regards as his invention "with sufficient particularity and distinctness, i.e., the claim must be sufficiently definite." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1348 (Fed. Cir. 2002).

A section 112 analysis "requires a determination whether those skilled in the art would understand what is claimed." *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 1217

(Fed. Cir. 1991) (citation omitted). To determine if "words of degree" are indefinite under 35 U.S.C. § 112, a court "must determine whether the patent's specification provides some standard for measuring that degree." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005) (quotations and citation omitted).

Claim 1 of the '590 patent is indefinite because the patents do not teach the ranges or proportions of materials necessary to form an electrolyte. *See Std. Oil Co.*, 774 F.2d at 453 (affirming "partially soluble" as vague under 35 U.S.C. § 112). Multisorb admits that "the exact amount of sodium chloride is not critical" and uses various amounts of water soaked blotters to add moisture. '590 patent col.3 l.18-20. Multisorb's patent never specifically states the amount of materials needed "to form a electrolyte" as required by the claims. '590 patent col.8 l.10.

Additionally, claims 1-3 of the '872 are also indefinite because again the scope of the claim cannot be determined. Based on a plain reading, the phrase "in relatively sufficient proportions" modifies annealed electrolytically reduced iron, salt, and the envelope. It is impossible to know, and the specification provides no support or explanation of, what a relatively sufficient proportion of an envelope may be. All claim limitations are meaningful and, therefore, may not be read out of the claims. *Randall May Int'l, Inc. v. DEG Music Prods., Inc.*, 378 Fed. Appx. 989, 998 (Fed. Cir. 2010); *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 547 (Fed. Cir. 1994). Even if "in relatively sufficient proportions" is read to only modify the terms annealed electrolytically iron and salt, in direct conflict to Federal Circuit precedent, the same infirmities still exist as in the '590 patent, namely it is unknown what proportions of electrolytically reduced iron and salt are necessary to form an electrolyte. Moreover, "sufficient proportions" is further modified by "relatively," making the construction of the term even more vague and ambiguous. Multisorb's claims broadly cover not only those compositions that have "sufficient proportions" of the claimed ingredients, but also those that have "relatively sufficient

proportions." *In re Oetiker*, 23 U.S.P.Q.2d 1641 (1990) (finding a claim indefinite because there is "no standard or guidelines" to determine to the extent of "relatively flat.'") (emphasis added). With so many modifiers, it is difficult, if not impossible, to determine what composition would be necessary to produce the electrolyte allegedly disclosed. Accordingly, claims 1-3 are invalid under 35 U.S.C. § 112.

Multisorb's construction of this term, like many of its others, would introduce confusing words with unknown meanings. Specifically, Multisorb seeks to define the term as "in an amount required to produce a desired outcome." It would not be possible to evaluate under any metric the meaning of "desired outcome." It would not be possible to evaluate the meaning of "desired outcome" under any method. Multisorb's construction is broader than the original term.

### 2. Tending To Retain Water

| Claim Term '872 patent, claim 3 | Pactiv's Proposed Construction | Multisorb's Proposed Construction |
|---|---|---|
| tending to retain water | impeding the migration of water out of the packet | capable of releasably retaining moisture |

As shown below, the packet in claim 3 of the '872 patent has an envelope (also referred to as a sachet, packet or package) containing an oxygen-absorbing composition. Based on a plain reading of claim 3, it is difficult to assess whether the composition or the envelope is responsible for "tending to retain water" as the word "which" seems to modify the word "composition."

> 3. A packet for absorbing oxygen comprising an oxygen-absorbing composition including . . . an envelope containing said composition <u>which</u> permits oxygen to pass there through <u>while tending to retain water therein</u>. (emphasis added).

When the specification is reviewed, however, it indicates that the material of the envelope or laminate "limit[s] or imped[es] migration of water out of the envelope."

> The preferred material from which an envelope 25 is fabricated is . . . a laminate 27 . . . . The foregoing laminate is especially desirable for the intended purpose of <u>limiting or impeding migration of water out of the envelope</u>. The envelope will tend to retain the water therein while permitting oxygen to pass therethrough.

'872 patent col.6 l.44-7:17 (emphasis added); '872 patent at [57] (". . . an envelope which will resist the passage of liquid water out of the envelope . . . .").

These statements from the specification are in accord with Pactiv's proposed construction of "tending to retain water" as "impeding the migration of water out of the packet." Multisorb again attempts to introduce definitions that are unsupported by the specification. Moreover, Multisorb's proposed construction will require the Court at a later date to construe the ambiguous limitation "capable of releasably," as it is not known what the patentee means by "capable" or "releasably."

Multisorb's construction is also flawed because it puts two opposite terms together to define a claim term that has a simple meaning. "Release" and "retain" are opposites. Logically, there is no support for pairing two opposite terms in a bizarre oxymoron meant to define just one of them. "Retain" should mean "retain," not "retain and also not retain."

### 3. Electrolyte ('590 And '872 Patents)

| Claim Term '590 and '872 Patents | Pactiv's Proposed Construction | Multisorb's Proposed Construction |
|---|---|---|
| electrolyte | a chemical compound that ionizes when dissolved or molten to produce an electrically conductive medium. | a conductive solution of ions in moisture |

Pactiv believes that the ordinary and customary meaning of the term, electrolyte to one of skill in the art at the time of the filing of the '590 patent and '872 patent is 'a chemical compound that ionizes when dissolved or molten to produce an electrically conductive medium.'

- 23 -

*See* THE AMERICAN HERITAGE COLLEGE DICTIONARY 442 (3d ed. 1993), (SA at 390). "Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation. *See Exhibit Supply Co. v. Ace Patents Corp*., 315 U.S. 126, 134 (1942) (relying on dictionaries to construe the claim term "embedded")." *Phillips*, 415 F.3d at 1322 (citations omitted).[4]

Multisorb's construction comes neither from intrinsic evidence, such as the specification or file history, nor from extrinsic evidence, such as a dictionary, and therefore should be rejected. Therefore, the definition of one of skill in the art at the time of the invention, a chemical compound that ionizes when dissolved or molten to produce an electrically conductive medium, should control.

**4. Salt For Combining With Water To Produce An Electrolyte ('590 And '872 Patents)**

| Claim Term '590 and '872 Patents | Pactiv's Proposed Construction | Multisorb's Proposed Construction |
| --- | --- | --- |
| salt for combining with water to produce an electrolyte | *see* salt as defined above *see* electrolyte as defined above | a substance that creates an electrolyte when dissolved in moisture |

Pactiv proffers that this term should be construed consistent with the construction provided above for the terms "salt" and "electrolyte." *Phonometrics, Inc. v. N. Telecom*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) (noting that "[a] word or phrase used consistently throughout a claim should be interpreted consistently."). Because the terms "salt" and "electrolyte" will be construed separately, as discussed above, the Court should not construe the terms a second time in combination without risking inconsistent or in this case, circular, constructions.

---

[4] As discussed previously the '590 and '872 have an effective filing date of May 26, 1992 because they claim priority to the application that matured into the '375 patent, which was filed on May 26, 1992.

Multisorb's construction attempts to delete the word "salt" from the claim limitation; a practice expressly forbidden under U.S. patent law. *See Randall May Int'l, Inc.*, 378 Fed. Appx. at 998; *Lantech, Inc.*, 32 F.3d at 547. Under Multisorb's construction, the term "salt for combining with water to form an electrolyte" would mean "any substance that forms an electrolyte." This definition is impossibly broad and is a clear attempt to impermissibly expand the scope of the asserted claims to include substances beyond the claimed salt.

The phrase "salt for combining with water to produce an electrolyte" clearly contains the terms "salt" and "electrolyte," which should be construed on their own, once, to ensure consistency throughout the claims.

## V.     CONCLUSION

Based on the plain language of the claims, the '560 and '872 patent specifications, the prosecution histories, the applicable law regarding claim construction, and the extrinsic evidence provided, the Court should adopt the claim constructions set forth above.

Respectfully submitted,

Dated: March 6, 2012                 By:  /s/ Mitchell S. Chaban

Mitchell S. Chaban
**LEVIN GINSBURG**
180 North LaSalle Street, Suite 3200
Chicago, Illinois 60601
Telephone: (312) 368-0100

David E. De Lorenzi (admitted *pro hac vice*)
Frank A. Bruno (admitted *pro hac vice*)
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Telephone: (973) 596-4500

*Attorneys for Plaintiff Pactiv Corporation*

- 25 -

<u>**CERTIFICATE OF SERVICE**</u>

I, Mitchell S. Chaban, an attorney at the law firm of Levin Ginsburg, hereby certify that

on March 6, 2012, **Opening Claim Construction Brief By Plaintiff Pactiv Corporation** was

electronically filed with the Clerk of the Court on behalf of Plaintiff Pactiv Corporation.

I hereby further certify that I caused true and correct copies of the foregoing document to

be served via electronic service upon the following individuals:

David H. Bluestone, Esq.
Gary M. Ropski, Esq.
**Brinks, Hofer, Gilson & Lione**
455 North Cityfront Plaza Drive
Suite 3600
Chicago, IL 60611-5599

Michael R. McGee, Esq.
Jennifer L. Friedman, Esq.
Laura A. Colca, Esq.
**McGee & Gelman**
200 Summer Street
Buffalo, NY 14222

Stephen B. Salai, Esq.
**Harter Secrest & Emery LLP**
1600 Bausch & Lomb Place
Rochester, NY 14604

Dated: March 6, 2012                      /s/ Mitchell S. Chaban
      Chicago, Illinois                      Mitchell S. Chaban