IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PACTIV, LLC,

                    Plaintiff,

          v.                              Case No. 10 C 461

                                          Hon. Harry D. Leinenweber
MULTISORB TECHNOLOGIES, INC.,

                    Defendant.

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION AND BACKGROUND

This patent infringement action concerns modified-atmosphere packaging technology for use in preserving raw red meat and other food products.  Plaintiff Pactiv, LLC ("Pactiv") and Defendant Multisorb Technologies, Inc. ("Multisorb") are competitors in the field of oxygen absorbers – packets of chemicals that react with moisture to absorb oxygen when placed inside food containers.  By removing oxygen from the atmosphere inside the container, these packets ensure that food remains fresh for an extended period of time.

In January 2010, Pactiv sued Multisorb for infringement of seven of its patents related to this oxygen absorber technology. Multisorb countersued, alleging infringement of two of its own patents.  In addition, Multisorb advanced counterclaims for tortious interference with business relations, false marking under 35 U.S.C. § 292, and unfair competition and false advertising in

violation of the Lanham Act, 15 U.S.C. § 1051 *et seq.* Pactiv's patent claims are currently stayed pending re-examination proceedings before the United States Patent and Trademark Office (the "PTO").

## II. DISCUSSION

Following claim construction on the Multisorb patents, the parties filed various Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Among the Motions pending are: (1) Pactiv's Motion seeking summary judgment of non-infringement; (2) Pactiv's Motion seeking summary judgment of invalidity; (3) Pactiv's Motion seeking summary judgment on Multisorb's tortious interference, false marking, and Lanham Act counterclaims; (4) Multisorb's Cross-Motion seeking summary judgment on Pactiv's invalidity counterclaims; (5) Multisorb's Cross-Motion seeking summary judgment on its false marking counterclaim; and (6) Multisorb's Motion seeking summary judgment on Pactiv's affirmative defenses to certain of Multisorb's counterclaims. The parties also have moved to strike various portions of the above Motions and to exclude from consideration the opinions of each other's expert witnesses.

The two Multisorb patents at issue are U.S. Patent No. 5,332,590, entitled "Method of Absorbing Oxygen by Employing a Particulate Annealed Electrolytically Reduced Iron" (the "'590 Patent"), and U.S. Patent No. 6,436,872, entitled "Oxygen Absorber"

(the "'872 Patent"). Both the '590 and '872 Patents descend from another Multisorb patent, U.S. Patent No. 5,262,375 (the "'375 Patent"), which is not asserted in this litigation. The '375 Patent describes an "oxygen-absorbing composition" containing particulate annealed electrolytically reduced iron ("PAERI"), a salt, and an optional water-attracting and supplying component. When the salt combines with moisture in the package, it forms an electrolyte that activates the iron and facilitates a chemical reaction that absorbs oxygen. Although oxygen absorbers containing electrolytically reduced iron had been in use for many years, Multisorb asserted that its "improved" composition could absorb oxygen at a more efficient rate due to its use of PAERI – electrolytically reduced iron that had been subsequently annealed – over other types of iron.

The '590 Patent describes a method for employing the PAERI-salt oxygen-absorbing composition claimed in the '375 Patent. The '872 Patent describes an oxygen-absorbing packet comprised of the PAERI-salt composition and a semi-permeable envelope that encloses the composition and retains water while permitting oxygen to pass through uninhibited.

### A.  Infringement of the '590 and '872 Patents

Multisorb accuses Pactiv of infringement of the '590 and '872 Patents through its sale of a line of oxygen absorber and packaging products that it markets under the trade name ActiveTech (the

"ActiveTech Product"). The ActiveTech Product is manufactured for Pactiv by a company named Desiccare and contains three main ingredients: malic acid, hydrogen reduced sponge iron sold under the trade name "NutraFine RS," and powdered cellulose. When the ActiveTech hydrogen reduced iron combines with moisture, an oxidation reaction begins and oxygen is absorbed. The malic acid serves as a catalyst in that reaction.

Originally, Multisorb contended that the ActiveTech Product infringed the '590 and '872 Patents both literally and under the doctrine of equivalents. During claim construction on the Multisorb patents, however, the Court construed the term "PAERI" to mean "electrolytically reduced particulate iron that has been subsequently annealed, with 'annealed' including hydrogen annealing," and the term "salt" to mean "the compound formed as the result of the reaction of acids and alkalis." *Pactiv, LLC v. Multisorb Technologies, Inc.*, No. 10 C 461, 2013 WL 120234, at *8-9 (N.D. Ill. Jan. 9, 2013). There being no dispute that the hydrogen reduced iron of the ActiveTech Product is not electrolytically reduced and that malic acid is an organic acid and not a compound formed by the reaction of acids and alkalis, Multisorb consequently abandoned its literal infringement theory and now proceeds under the doctrine of equivalents only. (*See,* Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J. of Non-Infr. ("Def.'s Non-Infr. Opp. Mem.") at 1, 6, ECF No. 423).

With respect to the iron element, Multisorb alleges that the ActiveTech Product's particulate annealed hydrogen reduced iron is insubstantially different from the claimed PAERI because it "perform[s] substantially the same function (rapid absorption of oxygen), in substantially the same way (by oxidizing iron) to achieve substantially the same result (both are used to substantially eliminate residual oxygen in the container)." (Def.'s Am. Final Infr. Contentions, Ex. 1, ECF No. 386-3). With respect to the salt element, Multisorb alleges that malic acid is insubstantially different from the claimed salt because it "perform[s] substantially the same function (forming an electrolyte) in substantially the same way (by dissociating into ions to produce an electrolyte) to achieve substantially the same result (to promote oxidation of iron)." (*Id.*). Pactiv not only disagrees with these comparisons, but contends that the doctrine of prosecution history estoppel bars Multisorb's equivalents argument altogether because, during the prosecution of the '375 parent patent application, Multisorb distinguished PAERI from hydrogen annealed iron that had not been electrolytically reduced and relinquished claim language over a range of salt equivalents in order to gain acceptance after facing a prior rejection by the patent examiner.

Prosecution history estoppel "prevents a patent owner from recapturing through the doctrine of equivalents subject matter

surrendered to acquire a patent." *Duramed Pharms., Inc. v. Paddock Labs., Inc.,* 644 F.3d 1376, 1380 (Fed. Cir. 2011). The doctrine may be invoked in two circumstances: (1) when the applicant submits a narrowing amendment to the claim in order to overcome a rejection by the patent examiner (sometimes called "amendment-based estoppel"); or (2) when the applicant cedes subject matter through arguments made to the patent examiner in an effort to secure allowance of a claim (sometimes called "argument-based estoppel"). *Voda v. Cordis Corp.,* 536 F.3d 1311, 1325 (Fed. Cir. 2008). Although the '375 Patent is not a part of the present lawsuit, statements and amendments made during the course of the prosecution of the '375 Patent apply to the '590 and '872 Patents by virtue of their shared familial relationship. *See, Pactiv,* 2013 WL 120234, at *5; *Goldenberg v. Cytogen, Inc.,* 373 F.3d 1158, 1167 (Fed. Cir. 2004).

In Claim 1 of its initial application leading to the '375 Patent, Multisorb detailed "[a]n oxygen-absorbing composition comprising in relatively sufficient proportions [PAERI], and salt means for producing an electrolyte." The patent examiner rejected this claim under 35 U.S.C. § 112, stating, in part, that "[t]he term – salt means – includes material beyond the scope of the invention and is indefinite without further specificity or qualification." The examiner further stated that Multisorb's invention was unpatentable in light of certain prior art that

rendered the claimed PAERI obvious under 35 U.S.C. § 103. Specifically, U.S. Patent No. 4,192,773 by Yoshikawa disclosed an oxygen absorber made from "electrolytic metal powders," which the examiner found to be essentially the same as PAERI except that it had not been annealed. Because U.S. Patent No. 5,151,262 by Pemsler taught hydrogen annealing as a means of reducing iron to decrease its oxygen content, the examiner concluded that PAERI was obvious when the Yoshikawa and Pemsler references were considered together.

In response to the examiner's rejection, Multisorb amended Claim 1 to read: "[a]n oxygen-absorbing composition comprising in relatively sufficient proportions [PAERI], and salt means for combining with water to produce an electrolyte which combines with said iron to cause it to absorb oxygen." In support of that amendment, Multisorb argued that it was "entitled to claim the [term] 'salt means' broadly" because it was not indefinite in view of the "large range of equivalent salts specifically recited" in the patent application. These included "without limitation" calcium chloride, potassium chloride, magnesium sulfate, magnesium chloride, barium chloride, potassium nitrate, potassium phosphate, potassium hypophosphate, sodium carbonate, and potassium carbonate. The preferred salt, however, was sodium chloride, the chemical compound that forms ordinary table salt.

With respect to the examiner's obviousness rejection of the claimed PAERI, Multisorb argued forcefully that PAERI could be distinguished from the Yoshikawa and Pemsler irons because there was "absolutely no teaching in Pemsler that the hydrogen annealed iron has been electrolytically reduced before it has been hydrogen annealed." Thus, Multisorb asserted that PAERI was "entirely different" because it was annealed *subsequent to electrolytic reduction* – a process that Multisorb contended gave PAERI oxygen-absorbing capabilities superior to that of mere hydrogen annealed iron. These statements were repeated substantially in a declaration submitted by Multisorb's inventor, George McKedy.

Thereafter, during a June 9, 1993 telephone conference with the patent examiner, Multisorb approved entry of an examiner's amendment deleting the word "means" from the claimed "salt means." Satisfied with the "salt" term as-amended and apparently having accepted Multisorb's representation that the process of electrolytic reduction followed by annealing differentiated PAERI from the prior art, the examiner issued a Notice of Allowance and the '375 Patent was issued.

As the foregoing file history demonstrates, Multisorb significantly narrowed the scope of its claims in order to gain allowance of the '375 Patent. In doing so, it is clear that Multisorb surrendered a range of iron and salt equivalents, including those encompassed in the ActiveTech Product.

Turning first to the iron element, by insisting that PAERI was "entirely different" from Pemsler's hydrogen annealed iron because Pemsler did not teach electrolytic reduction prior to annealing, Multisorb plainly ceded any claim over iron that is not electrolytically reduced before being annealed. Indeed, when an applicant distinguishes "the claimed invention over the prior art, [he] is indicating what the claims do not cover, [and] he is by implication surrendering such protection." *Vanguard Products Corp. v. Parker Hannifin Corp.,* 234 F.3d 1370, 1374 (Fed. Cir. 2000) (citation and quotation marks omitted); *see also, e.g., Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 1159 (Fed. Cir. 1998) (specification distinguished prior art as inferior and touted advantages of a conical shaped cup for use in an artificial hip device; "[s]uch statements make clear that the '589 patent discloses *only* shaped cups and nothing further") (emphasis in original). Since the ActiveTech Product's NutraFine RS iron is *not* electrolytically reduced (let alone, electrolytically reduced *before* it is annealed) it is precisely the type of iron that Multisorb sought to distance its invention from during the prosecution of the '375 Patent. In these circumstances, prosecution history estoppel applies to bar Multisorb from invoking the doctrine of equivalents in an effort to reclaim this previously-relinquished subject matter. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722, 733-35 (2002).

Although Multisorb contends that it could not have disclaimed the ActiveTech iron because NutraFine RS was not in existence when the '375 Patent was prosecuted, the Federal Circuit has expressly held that "an equivalent under the doctrine of equivalents *may* arise after patent issuance." *Al-Site Corp. v. VSI Int'l, Inc.,* 174 F.3d 1308, 1320 (Fed. Cir. 1999) (emphasis added); *see also, Ring & Pinion Serv., Inc. v. ARB Corp.,* 743 F.3d 831, 835 (Fed. Cir. 2014). Moreover, it is undisputed that NutraFine RS is simply the brand name for a type of hydrogen reduced iron, which was well-known in the art at the time of the '375 Patent's issuance. Indeed, the '375 Patent twice mentions hydrogen reduced iron in a section detailing the background of the invention and the various types of iron that could be utilized to make oxygen-absorbing compounds.

Multisorb's related argument – that it could not have surrendered claim scope with respect to the ActiveTech Product's hydrogen *reduced* iron because it only ever mentioned Pemsler's hydrogen *annealed* iron to the examiner – is similarly unavailing: hydrogen reduced and hydrogen annealed iron are the same thing. Nor, despite Multisorb's assertion to the contrary, would applying principles of prosecution history estoppel be inconsistent with the Court's prior rulings at claim construction. There, although the Court found that PAERI could encompass iron that had been annealed in a hydrogen atmosphere, it held specifically that Multisorb's

arguments to the patent examiner had effected a "clear disclaimer" of irons that were not electrolytically reduced and subsequently annealed. *Pactiv,* 2013 WL 120234, at *5-8. Thus, the only way the ActiveTech Product's iron could be found to be infringing, either literally or under the doctrine of equivalents, is if it were electrolytically reduced and then annealed, which, of course, it is not.

As for the salt element at issue in the parties' respective oxygen absorber products, Multisorb's initial use of the term "salt means," instead of just "salt," suggests that it originally sought to claim a category of equivalent materials that were not salt but were capable of performing the function of a salt within the overall oxygen-absorbing reaction (*i.e.,* producing an electrolyte that promotes oxidation of iron). Multisorb's intention in that regard was made explicit by its argument to the patent examiner that it was "entitled to claim the [term] 'salt means' broadly" and that such a claim encompassed an expansive array of equivalents, including, *but not limited to,* those recited in the claim specification. When the examiner rejected this argument on the basis that the term "salt means" was indefinite and included material that was beyond the scope of the invention, Multisorb agreed to narrow the limitation by amending "salt means" to "salt." The Supreme Court has held that "[a] patentee's decision to narrow his claims through amendment may be presumed to be a general

disclaimer of the territory between the original claim and the amended claim." *Festo,* 535 U.S. at 740.  Thus, by accepting the examiner's amendment in order to gain allowance, Multisorb surrendered its broader claim to various equivalents, such as the ActiveTech Product's malic acid, which otherwise might have been considered infringing based upon a functional similarity to salt. In light of that narrowing amendment, Multisorb is precluded from now asserting coverage over equivalents that it traded away previously.

In resisting this conclusion, Multisorb asserts that the deletion of the word "means" had the effect of broadening rather than constraining the scope of the salt limitation.  That contention, however, not only is belied by the examiner's stated rationale for rejecting the salt claim in the first instance, but is utterly baffling in view of Multisorb's companion argument that "salt means" actually means the same thing as "salt."  Although Multisorb also contends that it was prejudiced by the examiner's failure to treat the claimed "salt means" as a means-plus-function limitation in accordance with *In re Donaldson Co.,* 16 F.3d 1189 (Fed. Cir. 1994), that assertion contradicts its previous argument that "salt means" was never intended to be construed as a means-plus-function provision under 35 U.S.C. § 112, ¶ 6.  Moreover, while the Federal Circuit's decision in *Donaldson* instructed patent examiners to limit their construction of means-plus-function

clauses to the corresponding structure or materials described in the specification and any equivalents thereof (the old practice had been to give such limitations their "broadest reasonable interpretation"), *Donaldson,* 16 F.3d at 1193, the suggestion that the examiner would not have rejected "salt means" as indefinite under the post-*Donaldson* standard is wholly speculative. In any case, Multisorb never sought to reclaim the previously-rejected "means" limitation during the prosecution of the '590 and '872 Patents, which occurred well after *Donaldson* was decided.

To overcome prosecution history estoppel, a patentee must demonstrate either that (1) the alleged equivalent was unforeseeable at the time the narrowing was made; (2) the rationale for narrowing bore no more than a tangential relation to the alleged equivalent at issue; or (3) there was "some other reason" that the patentee could not have described the alleged equivalent. *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.,* 517 F.3d 1364, 1376 (Fed. Cir. 2008). No such showing has been made in this case. First, both malic acid and hydrogen reduced iron were well-known in the art and, thus, foreseeable as equivalents at the time Multisorb applied for the '375 Patent. Second, it is undisputed that Multisorb's acceptance of the salt amendment, as well as its efforts to distinguish PAERI from other types of iron, were made in response to the examiner's concerns regarding the overbreadth of Multisorb's original claims. Multisorb's rationale for narrowing

therefore bore directly on the patentability of its claims and the alleged equivalents at issue in this case. Finally, since Multisorb was aware of the existence of malic acid and hydrogen reduced iron, there appears to be no reason why it could not have drafted a claim that encompassed these materials as equivalents.

Thus, in the absence of any evidence rebutting the presumption of prosecution history estoppel, the Court finds that Multisorb is barred from pursuing an equivalents infringement claim here. Summary judgment therefore is granted in favor of Pactiv on Multisorb's patent infringement counterclaims.

## B. Multisorb's Remaining Counterclaims

Multisorb's three remaining counterclaims arise out of a failed business arrangement with Pactiv, under which Multisorb agreed to manufacture and sell oxygen absorber packets to Pactiv for use in its fresh meat packaging system, which it markets to customers as the "ActiveTech System." The ActiveTech System is comprised of the ActiveTech Product (namely, an oxygen absorber packet), a "case ready" packaging system, and Pactiv's methods for packaging products.

On December 16, 1997, shortly after the companies entered into a supply agreement, Pactiv secured the issuance of U.S. Patent No. 5,698,250, entitled "Modified Atmosphere Package for Cut of Raw Meat" (the "'250 Patent"). The '250 Patent describes a packaging system and a method for sealing and preserving raw meat in a low or

reduced oxygen environment. The claimed method includes the placement of an oxygen-absorbing packet together with raw meat inside of a container that is then sealed within a larger outer container. At Pactiv's request, Multisorb marked the oxygen absorber it supplied to Pactiv with a stamp indicating that the product was protected under the '250 Patent.

In 2008, the companies' business relationship soured after Multisorb began selling its oxygen absorbers to Wal-Mart and several Wal-Mart vendors directly, many of whom previously had been Pactiv customers. In response, Pactiv entered into an agreement with Desiccare, Inc. for the joint development of a new oxygen absorber that could replace the Multisorb absorber within the ActiveTech System. Thereafter, Pactiv switched manufacturers to Desiccare while continuing to mark the Desiccare absorber with the '250 Patent.

As this suit proves, Pactiv and Multisorb have not enjoyed an easy coexistence as competitors in the market for oxygen absorber products. Indeed, Multisorb's three remaining counterclaims accuse Pactiv of a potpourri of misconduct, mostly relating to its practice of marking its oxygen absorbers with the '250 Patent, its enforcement of its patents at issue in this suit, and its alleged misrepresentations to potential Multisorb customers.

The first of these counterclaims charges Pactiv with initiating "sham litigation" against Multisorb with the intention

of interfering with its prospective business relationships.  As
evidence of Pactiv's allegedly improper motive, Multisorb points to
various statements made by Pactiv in internal e-mails and memoranda
prior to the initiation of this lawsuit:

- "[Pactiv's] ultimate business objective would
  be to address Multisorb's incursion into this
  market" and suing Multisorb would "[e]ngage
  directly with [that] objective."

- Pactiv should "[s]ue both Multisorb and
  Mitsubishi" in order to "[s]tart a bidding war
  for settlement."

- "We . . . need to get Multisorb in control if
  possible by enforcement of Pactiv patents."

- "Play hardball with Multisorb:  Take legal
  action to tie them up."

- "Many patents would have to be litigated if
  someone sued Pactiv.  This would be expensive
  and time consuming for them."

To begin with, Multisorb appears to be conflating a claim for
engaging in sham litigation in violation of federal antitrust law
with a claim under Illinois law for tortious interference with
prospective business relations.  A sham litigation claim requires
proof that the lawsuit at issue is both "objectively baseless in
the sense that no reasonable litigant could realistically expect
success on the merits" and that the lawsuit has been brought in "an
attempt to interfere directly with the business relationships of a
competitor."  *Prof'l Real Estate Investors, Inc. v. Columbia
Pictures Indus., Inc.,* 508 U.S. 49, 60-61 (1993) (italics and
quotation marks omitted).  Meanwhile, in order to succeed on a

claim for tortious interference with prospective business relations, a party must demonstrate that (1) it had a reasonable expectancy of entering into a valid business relationship, (2) the defendant had knowledge of that expectancy, (3) the defendant intentionally and unjustifiably interfered with the relationship by inducing or causing a termination of the expectancy, and (4) the defendant's interference caused damages. *Cook v. Winfrey,* 141 F.3d 322, 327 (7th Cir. 1998).

To the extent that Multisorb's allegations can be construed as a sham litigation claim, it should be noted that "[t]he law recognizes a presumption that the assertion of a duly granted patent is made in good faith . . . [and that] this presumption is overcome only by affirmative evidence of bad faith." *Golan v. Pingel Enterprise, Inc.,* 310 F.3d 1360, 1371 (Fed. Cir. 2002). Moreover, even assuming that Pactiv's statements expressing a desire to "get Multisorb in control" by commencing patent litigation against it could be considered sufficient evidence of bad faith, there simply is no basis for concluding that Pactiv's infringement accusations have no reasonable chance of success on the merits. Although, recently, Pactiv's patents were declared invalid during re-examination proceedings before the Patent Trial and Appeal Board (Pactiv has appealed that decision to the Federal Circuit), there is nothing to suggest that Pactiv would have had any reason to think that its duly granted patents were illegitimate

at the time it filed this lawsuit.  Thus, because Multisorb has failed to demonstrate that Pactiv's claims were objectively meritless, it cannot avail itself of the sham litigation doctrine.

Multisorb's tortious interference claim fails for substantially the same reasons.  A claim for tortious interference with prospective economic relations "requires, among other things, an intentional and *unjustified* interference by the defendant." *Hukic v. Aurora Loan Servs.,* 588 F.3d 420, 433 (7th Cir. 2009) (emphasis added).  Thus, the mere filing of a lawsuit cannot serve as a basis for a tortious interference claim when there has been no showing that the litigant knew or should have known the case was meritless or otherwise unjustified.  Because the record is devoid of any such evidence, Multisorb's claim must be rejected.

As for Multisorb's false marking counterclaim, Multisorb has failed to present evidence that Pactiv intended to deceive the public by marking the ActiveTech oxygen absorber with the '250 Patent.  "The bar for proving deceptive intent . . . is particularly high, given that the false marking statute is a criminal one, despite being punishable only with a civil fine." *Pequignot v. Solo Cup Co.,* 608 F.3d 1356, 1363 (Fed. Cir. 2010). At best, Multisorb has shown that Pactiv "did not recall any discussions as to what patent number to put on the Desiccare oxygen absorber" and that Pactiv "did not have a formal process in place to approve product covers."  That evidence, however, does not

suggest any culpability beyond mere negligence.  Because there is no other proof that could support an inference that Pactiv acted in bad faith, summary judgment is granted in favor of Pactiv on Multisorb's false marking counterclaim.

Turning finally to Multisorb's Lanham Act counterclaim, Multisorb asserts that Pactiv misled customers by telling them that the ActivTech System was protected by a patent when, in fact, it was not.  To sustain a claim under the Lanham Act, a plaintiff must establish that (1) the defendant made a false or misleading statement of fact in commercial advertising or through the promotion of its goods and services, (2) the statement actually deceived or tended to deceive a substantial segment of its audience, (3) the deception likely influenced the customer's purchasing decision, (4) the defendant caused the statement to enter interstate commerce, and (5) the statement resulted in injury to the plaintiff.  *Zenith Electronics Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1348 (Fed. Cir. 1999).

Multisorb's claim founders because it has failed to show that Pactiv's conduct tended to deceive any portion, let alone a *substantial* portion, of its audience or that the deception contributed to its customers' purchasing decisions.  Indeed, none of the customers deposed in this case indicated that they cared the least bit whether the ActiveTech System was patent protected.  The Executive Vice President and Chief Operating Officer of The AVA

Company, a Long Island, New York meatpacking company, testified that the existence of Pactiv's patents did not influence his decision to use Pactiv's ActiveTech System or Product. The General Manager of Boston Lamb & Veal Co., Inc., a Boston-based meatpacking company, testified similarly that patents play no role in its purchasing decisions. The Product Development Manager of Superior Farms, a California meatpacking company, stated that he did not recall discussing patents related to the ActiveTech System with Pactiv. Finally, a strategic sourcing employee at Cargill Meat Solutions Corp., a Kansas meatpacking company, stated that the fact that the ActiveTech System was protected by a patent "didn't really affect our decision-making process because we were going to go down that technology anyway." Cargill's witness further indicated that whether or not Pactiv's patent was valid would not have altered Cargill's bidding or sourcing process. In view of the foregoing, Multisorb's Lanham Act counterclaim must be rejected.

### III. CONCLUSION

For the reasons stated herein, the Court rules as follows:

1.   Grants summary judgment in favor of Pactiv on Multisorb's Counterclaims 7 through 12;

2.   Denies Multisorb's Cross-Motions for Summary Judgment on its infringement and false marking counterclaims;

3.   Denies as moot Multisorb's Motion for Summary Judgment on Pactiv's affirmative defenses; and

4.    The balance of the pending motions are denied as moot. The Clerk of the Court is requested to close the motions pending at ECF Nos. 350, 372, 376, 378, 381, 392, 401, 413, 418, 424, 429, 450, and 452.

**IT IS SO ORDERED.**

_____
                    Harry D. Leinenweber, Judge
                    United States District Court

Date:7/2/2014